UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

STACY VENABLE,           )
                         )
            Plaintiff    )
                         )
     v.                  )          Civ. No. 1:07-168-JAW
                         )
T-MOBILE USA, INC.,      )
                         )
            Defendant    )

**RECOMMENDED DECISION ON
MOTION FOR SUMMARY JUDGMENT
AND ORDER ON MOTION TO STRIKE**

Stacy Venable worked for T-Mobile as a trainer of customer service representatives for

one year, almost to the day.  Five months after starting, Venable was diagnosed with epilepsy

and subsequently tried various anti-seizure medications.  On her fourth medication trial, less than

a month prior to her termination, Venable stated that she would like to start a leave of absence,

based on her doctor's recommendation that she avoid being at work while she adjusted to

potential side effects impacting mood and temperament.  According to one version of the facts,

her supervisor dissuaded her from applying, saying it was a bad time for her to leave and that he

would "monitor" her conduct.  She was fired soon after, by the same supervisor, after she yelled

at a class of trainees and after one trainee cried when Venable chastised her following a difficult

customer service call the trainee botched.  This federal civil action followed, by way of removal,

based on claims of failure to accommodate and discriminatory discharge in violation of the

Maine Human Rights Act, exclusively.  T-Mobile has filed its motion for summary judgment,

requesting a dispositive ruling in its favor on both claims.  The Court referred the motion to me

for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons that

follow, I recommend that the Court deny the motion.

## FACTS

The following facts are material to the defendant's motion for summary judgment.  The

facts are drawn based on a review of the parties' competing statements of material facts filed in

accordance with Local Rule 56, and based on the record sources reviewed in connection with

those statements.  See Doe v. Solvay Pharms., Inc., 350 F. Supp. 2d 257, 259-60 (D. Me. 2004)

(outlining the mandatory procedure for establishing factual predicates needed to support or

overcome a summary judgment motion); Toomey v. Unum Life Ins. Co., 324 F. Supp. 2d 220,

221 n.1 (D. Me. 2004) (explaining "the spirit and purpose" of Local Rule 56).  Factual disputes

exist in the record.  The following recitation resolves those disputes in favor of the non-movant,

Stacy Venable, as required by law.  See P. R. Elec. Power Auth. v. Action Refund, 515 F.3d 57,

62 (1st Cir. 2008).

Stacy Venable worked for T-Mobile in the position of Trainer I between the dates of June

7, 2005, and June 8, 2006.  (Def.'s Statement of Material Facts (DSMF), ¶ 6, Doc. No. 30.)  The

Trainer I position called for Venable to train customer service representatives (CSRs) to handle

customer service phone calls.  (Id. ¶ 10.)  A course or class of CSR training takes five weeks.

(Id. ¶ 11.)  As a trainer, Venable acted as a classroom facilitator, coach and supervisor to her

trainees.  (Id. ¶ 13.)  During her employment with T-Mobile, Venable's direct supervisor was

Todd Hicks, a Training Manager.  (Id. ¶ 7.)  One of the core values that T-Mobile requires its

trainers to internalize is the value of team effort, which T-Mobile captures in its mantra, "Team

Together Team Apart."  (Id. ¶¶ 15, 18, 19.)  It is expected of T-Mobile trainers that they be able

2

to build rapport with others to create a team environment and foster a team ethic in their trainees. (Id. ¶¶ 20-22.)

It is agreed that Ms. Venable is "upfront and abrasively honest" and that she has trouble hiding her feelings or dealing with people who do not like her.  (Id. ¶¶ 24-25.)  Venable has been known to "make faces" or expressions during meetings.  (Id. ¶ 26.)  Venable agrees with T-Mobile that trainers who are rude, disrespectful, abrasive, threatening or intimidating cannot foster a team environment.  (Id. ¶¶ 28-30.)

T-Mobile's employment policies include a policy regarding reasonable accommodation of individuals with disabilities.  The policy states that T-Mobile "reasonably accommodates the known physical and mental disabilities of otherwise qualified employees to assist them in performing the essential functions of their jobs . . . ."  The policy also states that an "employee who believes that he or she requires a reasonable accommodation should contact a local Human Resources representative."  Venable acknowledges that she received a copy of this policy at the commencement of her employment.  (Id. ¶¶ 3-5.)

*2005*

Between her June 7 start date and the end of October, 2005, Todd Hicks coached Venable on a few occasions concerning professional office comportment and the use of positive feedback in relation to training.  In particular, Venable made some disrespectful comments about human resources.  Venable also had some trouble managing the first class of CSRs she trained in October 2005.  These incidents resulted in more coaching from Todd Hicks.  (Id. ¶¶ 53-70.) These collective events were noted in Venable's performance evaluation for 2005, in which she received a rating of "unacceptable" in the performance category of "practice team together team apart."  (Id. ¶ 72.)  In the evaluation, Todd Hicks asserted that Venable had a tendency to show

3

frustration with facial expressions and disparaging remarks.  (Id. ¶ 73.)  It is apparent from the record citations that Venable had some trouble dealing with difficult students who had their own issues to contend with and that there was a lot of frustration going around on account of it being a first class at a newly established call center.  (Pl.'s Statement of Material Facts (PSMF) ¶¶ 65-69, 140-141, 146-148, Doc. No. 35;  Venable Dep. 46-49, 78-81, Doc. No. 30-2.)  Chiefly, members of Venable's first class who were angry about their performance on their first set of calls and with the overall training program complained that they were considering not coming back.  T-Mobile wants to place all of this at Venable's door because, prior to this expression of frustration by the class, Venable responded to one trainee's comment about "crappy calls" that it was not the "crap coming in" that was the problem, but the "crap going out."  (PSMF ¶¶ 66, 68.) However, in a group session meant to address these developments, the students told Venable, in the presence of Hicks, that they respected her and appreciated her training efforts, and that they did not want her to leave them alone in the "pod" with the coach and floor support from the visiting call centers, but rather wanted her to remain in the pod with them to assist them in taking their calls and to score their calls while in the pod rather than remotely from the "huddle rooms." (Id. ¶ 148.)  This fact invites an inference that the primary student frustration was with the set up of the training program and not hurt feelings over Venable's use of the word "crap."  Evidently not regarding her as a lost cause, Hicks set goals in Venable's subsequent evaluation related to her office interactions and personal accountability.  (Id. ¶¶ 74-75.)

On November 4, 2005, Venable had two seizures, was subsequently diagnosed as having epilepsy, and began taking the anti-seizure drug Depakote.  She was out of work for one week. (DSMF ¶¶ 32-34.)  Due to the side effects of that medication, Dr. Jutta Eichelman switched Venable's medication to Phenobarbital.  (Id. ¶ 36.)  Venable experienced side effects from

4

Phenobarbital as well, including fatigue, memory loss, and forgetfulness.  (Id. ¶ 38.)  Venable asserts that the Phenobarbital did not make her any more or less aggressive or assertive than normal.  T-Mobile attempts to establish that Phenobarbital made Venable more aggressive, but the assertion is supported only insofar as it appears to have become a concern for Venable in January 2006, when it was first reported to Venable that she said a cuss word in class, recounted below.  (Id. ¶¶ 38-39;  PSMF ¶¶ 38-39;  Venable Dep. at 120.)  In any event, T-Mobile does not introduce in its statement any witness accounts of aggressive misconduct occurring in November or December of 2005.

*2006*

In January 2006, Venable was gradually weaned off Phenobarbital.  (DSMF ¶ 41; PSMF ¶ 159.)  Also in January, Todd Hicks named Venable "trainer of the month."  (PSMF ¶ 158.)  T-Mobile offers a collection of statements to suggest that Venable's second class was unsuccessful (DSMF ¶¶ 77-79), but the record supports a finding that it was Venable's performance during the second class that garnered her the trainer of the month accolade.  (Venable Dep. at 43.)  Similarly, T-Mobile highlights a comment made by Hicks in his coaching evaluation of Venable's performance with her second class, to wit:  "Keep emotions in check."  (DSMF ¶¶ 79-82.)  A review of the entire evaluation form reflects praise and encouragement rather than criticism.  (Hicks Dep. Ex. 6, Doc. No. 30-4 at 70.)  Sometime in January, Venable may have said a cuss word in front of her class, maybe even the "f" word, but it is disputed what was actually said and it also appears that Hicks did not regard it as a significant issue, insofar as he told a senior trainer (Ryan Witham) to take it up with Venable, rather than addressing it himself.  And again, Hicks did name Venable trainer of the month for January 2006 in connection with her performance with her second class.  (PSMF ¶ 158.)  When it was reported to her by the senior

trainer that she swore in class, Venable was surprised and raised the issue with her doctor, concerned that Phenobarbital may have reduced her inhibitions or prevented her from remembering what she said.  It appears that this report to her doctor may have resulted in the decision to wean Venable off Phenobarbital.  (DSMF ¶¶ 116-117;  PSMF ¶¶ 116-117.)

When Venable went to Hicks to tell him what was happening in regard to her epilepsy and medication, he offered to give her any assistance she needed, including providing her with the paperwork needed to request a leave of absence.  (DSMF ¶ 118.)  Lori Davidson, a local T-Mobile's human resources representative, told Venable that T-Mobile would grant her a leave if she thought it would be helpful.  (DSMF ¶ 119.)  At some point, Hicks provided Venable with that paperwork and Davidson explained how to fill it out.  (DSMF ¶¶ 120, 122.)  Venable declined the offer and told them she was working with her doctor to handle it by changing medication.  (DSMF ¶ 121.)

In February, Venable began taking a new anti-seizure drug, Lamictal.  (DSMF ¶ 42.)  Because that medication caused her to break out in hives, it was discontinued by March.  (Id. ¶ 43.)  It would appear that Venable was training her third class at the time, but that is not spelled out by the parties.

In April 2006, Venable began training her last class of CSRs.  (Id. ¶ 84.)

On May 12, Venable began taking Topomax for her epilepsy.  (Id. ¶ 44.)  That drug made Venable feel tense and agitated.  (Id. ¶ 45.)  Venable describes herself as being "quite snappy" and "aggressive" in this timeframe.  (Id.)  She acknowledges that there may have been things that she or others said that she has no memory of.  (Id. ¶ 46.)[1]  When the medication was first

---

[1]     Venable believes the snappiness and aggression symptoms subsided by December 2006.  (DSMF ¶ 47.)  Venable has testified, however, that she still sometimes blamed the Topomax for angry outbursts *at home*, though

prescribed on May 12, Venable's doctor recommended to her that she take a leave of absence and that same morning Venable went to work early to tell Hicks that she was ready to do the paperwork to take a leave of absence so she could adjust to her new medication.  Venable did not dress for work that morning because she did not think that Hicks would deny her request.  Hicks told her that she was seeking leave at a bad time because she was five weeks into the training session and the class was used to her, that there was nobody available to take her class, that there was nothing he could do for her, that it would be better if he just monitored her behavior, and that, if a problem arose, they could revisit the issue of leave.  Hicks told her to report to Davidson of human resources that he had denied her request.  According to Venable, she did report to Davidson what Hicks had told her and Davidson did not tell Venable that Hicks lacked the authority to deny her leave.  (DSMF ¶¶ 131-132;  PSMF ¶¶ 126, 129, 131, 170-175;  Venable Dep. at 183;  Venable Aff. ¶¶ 26-27, Doc. No. 35-3.)[2]

According to Todd Hicks, on May 25, 2006, he overheard Venable speaking harshly to her class, telling them they needed to grow up.  (DSMF ¶ 94.)  Venable offers a denial of this statement, but her testimony is to the effect that she does not remember doing it.  She also asserts that, whether or not it happened, Hicks never spoke to her about it.  (PSMF ¶ 94.)

---

she now believes that she was just making excuses for her family-related behavior.  (Id. ¶ 50.)  For purposes of summary judgment, I reject the inference that Venable's mood in the workplace was never impacted by Topomax.

[2]     T-Mobile asserts that there were in fact trainers available to take over Venable's class.  Venable sufficiently qualifies these statements by stating that Hicks nevertheless told her that no one would take over her class.  (DSMF ¶¶ 135-139;  PSMF ¶¶ 135-139.)  T-Mobile also objects to Venable's statements describing her alleged exchange with Hicks and Davidson because they "contradict or add[] details that were missing from" Venable's deposition testimony.  (Def.'s Reply Statement ¶¶ 171-174.)  T-Mobile fails to support its objection with a citation to deposition testimony that forecloses the additional details offered by Venable in her summary judgment affidavit.  I have reviewed the passages of Venable's deposition testimony that are cited by the parties and I did not observe any clear contradictions, only refinements.  It is apparent from the competing summary judgment submissions that there is a genuine dispute whether T-Mobile denied a request for leave made in May 2006.

On June 2, 2006, only one of Venable's trainees was prepared to move onto the floor to take customer calls without assistance from a trainer. Evidently, it was time for the class to "graduate," but most were not ready. (DSMF ¶ 96; Venable Dep. at 102-103.)[3] Someone with oversight authority decided to graduate them anyway and to put them on the daytime shift with a trainer named Alec, who would provide supervision and assistance to them. Todd Hicks maintains that he initially attributed the poor preparedness of the class to Venable's demeanor with her class. However, Venable testified that Hicks initially denied that it had anything to do with her. (DSMF ¶ 98; PSMF ¶ 98.) At first, Venable continued to be involved with the class through coaching and quality scoring, as in monitoring calls for quality assurance. (PSMF ¶ 98.) Within a few days, however, Hicks told Venable that she was not to go near the team again. (DSMF ¶ 98; PSMF ¶¶ 98-99; Venable Dep. at 144; Venable Aff. ¶ 37.) It appears that that decision related to the following incident, though timing is uncertain. T-Mobile relates that Venable had an angry moment involving a CSR trainee named Ruthie. Venable coached Ruthie about keeping up with technical issues after Ruthie spent an hour with a customer on the phone, misinforming him as to an issue that Venable resolved in two minutes after she took over the call. (Id. ¶¶ 85-86; PSMF ¶¶ 85-86, 181; Venable Aff. ¶ 33.) When she was later informed by a human resources representative that Ruthie was afraid of her, Venable commented that that was a good thing. (DSMF ¶ 87.)[4]

---

[3]     Venable's deposition testimony is to the effect that this fact is "absolutely" true. For some reason, she denies it in her opposing statement.

[4]     One T-Mobile employee has offered a statement that Venable, on two occasions that he witnessed, bent over a CSR trainee and yelled at him or her in front of the entire team. Venable testified at her deposition that she does not believe that the employee offering the statement is lying. (DSMF ¶¶ 90-91; PSMF ¶¶ 90-91.) There is no indication when these incidents occurred.

On June 8, 2006, Hicks informed Venable that her employment was at an end because "it's just not working out."  (PSMF ¶ 193.)  T-Mobile maintains that Mr. Hicks decided to terminate Plaintiff because of her failure to improve how she conducted herself toward her students and her peers and because he believed it was apparent that Venable's improper behavior was not going to change.  (DSMF ¶ 108.)  Venable responds to this contention that Hicks did not give her any reason for her termination other than "it just wasn't working out."  She concedes that some instances of misconduct occurred while she was adjusting to Topomax.  She also notes that T-Mobile informed the Bureau of Unemployment Compensation that Venable was discharged for unsatisfactory performance and that "[t]here was no misconduct involved."  (PSMF ¶¶ 106-108, 198;  see also Deputy's Decision and TALX facsimile, Doc. No. 35-2.)[5]  Venable also offers that T-Mobile never instituted any formal written discipline concerning her conduct, something that would ordinarily have been called for under T-Mobile's corrective action policy.  (PSMF ¶¶ 191-192.)  T-Mobile responds that Venable was verbally counseled or coached, as Venable has acknowledged.  T-Mobile also, counterproductively, cites Hicks's deposition testimony to the effect that whether the different steps or levels of discipline are triggered depends on the situation.  (Def.'s Reply Statement ¶ 192.)  The fact that Venable's "situation" never resulted in a written reprimand supports an inference in Venable's favor, for purposes of summary judgment, with respect to the alleged seriousness of her misconduct.  Finally, when Hicks told Venable that she was being terminated, she responded that it would be better if she

---

[5]      T-Mobile objects to the use of its report to the Bureau of Unemployment Compensation, arguing that the standards for misconduct differ, that misconduct for purposes of unemployment compensation concerns "*intentional* disregard" of an employer's standards.  (Def.'s Reply Statement ¶ 198 (emphasis in original).)  It is not clear whether T-Mobile is acknowledging that Venable's alleged misconduct was unintentional, such as by virtue of the side effects of her medication, because T-Mobile does not elaborate.  In any event, I conclude that there is nothing inappropriate about Venable's use of the report in support of her case.  T-Mobile offers no challenge to the admissibility of the documents, only an objection based on materiality.

did not work directly with people, but instead by herself.  She is quoted as saying:  "Don't worry about it.  I'd rather have a job at this point just one-on-one with a computer and me.  I've had enough for a little while."  (DSMF ¶ 112.)  For purposes of summary judgment, the appropriate inference is that Venable had a difficult job and perhaps was not ideally suited for it.  It does not justify a summary judgment inference that she was not capable of performing the essential functions of her job with, or without, a reasonable accommodation.

Venable has secured an opinion from Heidi L. Henninger, M.D., to the effect that Venable had an adverse reaction to Topomax that included the temporary side effects of mood instability and disinhibition, which is in keeping with the side effects that many patients experience with the drug.  (PSMF ¶ 197.)

### THE MOTION TO STRIKE

The foregoing report of the material facts, drawn in the light most favorable to the non-movant, was a relatively straight-forward affair.  This might come as a surprise to the parties, based on the many Rule 56(e) objections raised in both parties' responsive statements.  I have not addressed each of these comments in a paragraph by paragraph fashion because to do so would undermine the efficacy of Local Rule 56 and would turn this Recommended Decision into an utterly tedious affair.  In many instances, addressing the objections point by point would serve no purpose anyway because the "fact" at issue could be stated in a light favorable to the plaintiff based on the existence of other record references that were not objected to.  In other words, as often as not, the challenged evidence would not be determinative of a factual dispute.  If there is some critical evidentiary objection that I appear to have ignored based upon my recitation of the facts, the parties have the ability to raise it in an objection to this Recommended Decision.  It should be noted that my failure to include a particular fact that was objected to does <u>not</u> mean

10

that I sustained the objection.  It is as likely that I concluded that the fact did not need to be recited because it would not change the outcome of the motion.  That is all I will say about the mine run of evidentiary objections.  That leaves the plaintiff's more forceful motion to strike, which is captioned "Plaintiff's Motion to Strike Defendant's 'Objections' to Plaintiff's Opposition to Defendant's Statement of Material Facts."  (Doc. No. 39.)  This motion requires an order.

    With her motion, the plaintiff asks the Court to strike the first 27 and one-half pages of the defendant's reply statement of material facts.  (Doc. No. 37.)  The first 27 and one-half pages of defendant's reply consist of a paragraph by paragraph "objection" to plaintiff's response to T-Mobile's original statement of material facts.  Local Rule 56 does not contemplate a third, fourth or fifth round of point/counterpoint in the summary judgment factual presentation anymore than it contemplates "motions to strike."  Although it is discouraging to see these sorts of filings of motions to strike, I must say that this one is largely appropriate, even if it is not condoned by Local Rule 56.  The defendant's reply is crammed with objections that are clearly not called for, making it at least understandable that the plaintiff felt the need to proceed in this fashion.  I will approach the motion categorically rather than paragraph by paragraph, granting it in part.  Although I cannot easily quantify the number of pages that should be stricken, it is likely close to 20.  The nature of the objections are as follows.

> *"T-Mobile objects to Plaintiff's qualification of this statement of fact and states that it should be stricken."*

    All of these objections are stricken.  The Court is fully able to review the portions of the record cited by both parties in relation to a dispute over a statement offered by one party and a qualification offered by the other, including whether the statement should be reworded in light of the qualification, possibly in language not offered by either party.

11

*T-Mobile objects to Plaintiff's denial of this statement of fact and states that it should be stricken.*

All of these objections are stricken for the reasons stated in the preceding paragraph.

*"T-Mobile objects to Plaintiff's objection to this statement of fact and states that it should be stricken because Plaintiff does not admit, deny or qualify this statement of fact as required by Fed. R. Civ.P. 56(e), and therefore it should be deemed admitted."*

In a few instances, the plaintiff objected to a statement offered by the defendant and asked that it be stricken, without additionally admitting, denying or qualifying the statement in the event that her objection was overruled.  The failure to admit, deny or qualify the statement is contrary to Local Rule 56(e), which provides:  "Without prejudice to the determination of the request to strike the party shall admit, deny or qualify the statement as provided in this rule."  In reply, the defendant asks that the objection be stricken and that its statement be deemed admitted.  Local Rule 56(f) says that a statement shall be deemed admitted unless properly controverted, "if supported by record citations."  Once again, the Court is fully capable of policing this particular aspect of the Local Rule without the aid of a request to strike.  This objection crops up in three instances.  I will briefly outline my approach to the statements at issue.

First is statement 38.  Ultimately, I did not treat the defendant's statement 38 as admitted because I concluded that the record citations the defendant offered did not warrant it, given the particular way the statement was worded.  Additionally, it is necessarily qualified by dint of the defendant's statement 39, as qualified by the plaintiff, and the related record sources.  Had the defendant's citation fully supported the statement it offered, and were the statement not qualified by other record sources cited by both parties, I would have deemed it admitted.

Second is statement 41.  The statement is to the effect that Venable started being weaned off Phenobarbital on January 9, 2006, and that the process took "more than two weeks."  (DSMF ¶ 41.)  Venable's testimony, which is cited by the defendant, is to the effect that she was taken off the drug January 16.  The defendant also cites a "dictated but not reviewed" letter to Venable's medical file, dated January 9, 2006, regarding a neurological re-evaluation, which is an exhibit associated with the deposition of a doctor other than the one who dictated the note.  The defendant does not cite any "introductory" testimony from the deponent, just the deposition exhibit, which, presumably, is the reason why the plaintiff objected.  I chose to render the statement as follows:  "In January 2006, Venable was gradually weaned off Phenobarbital."  (Id. ¶ 41.)  Frankly, I did so because neither party made it apparent what difference it would make whether the decision to wean Venable from Phenobarbital was made on January 9 versus some other day in January.  Indeed, when the plaintiff offers in her additional statement 159 that it occurred "in January," the defendant simply admits the statement, without qualification as to the particular day.  In this context, it appears that the parties are simply objecting for the sake of objecting.  That is a waste of everyone's time and energy.[6]

Finally, the objection appears in relation to statement 111.  After I reviewed the testimony cited by the defendant, I concluded that the plaintiff's original objection was a good one.  Her error was simply not including "denied" and incorporating the same record citations that the defendant had cited, but placed in context.   The portions of Dr. Henninger's deposition

---

[6]      Incidentally, the defendant also fails to properly respond to one of the plaintiff's additional statements.  At paragraph 158, Venable introduces the fact that she was named trainer of the month in January 2006.  After objecting and requesting that the statement be stricken as *immaterial* (?!), itself an utterly inappropriate request, the defendant states:  "In the alternative, should this statement of fact be considered . . . it is **Admitted** that this is what Plaintiff says in her affidavit."  While it is true that the defendant uses the term "admitted," it has not actually admitted, denied or qualified the statement offered by the plaintiff.  This is a circumstance in which I have deemed a challenged statement to be admitted.

13

testimony that are cited by the defendant do not support a statement that Dr. Henninger "agrees that Plaintiff exhibited a well-documented pattern of improper conduct, including problems with irritability and inappropriate interactions with others that cannot be attributed to Plaintiff's adjusting to medications for her medical condition."

> *"[T]his fact should be deemed admitted for Plaintiff's failure to provide a pinpoint citation to support her qualification as required by F.R. Civ.P. 56(f)."*

The Defendant objects in numerous instances because the plaintiff cites more than a solitary page of deposition testimony in some instances without specifying line numbers. Local Rule 56(f) requires a citation to specific page, not specific lines. The citation of specific lines is something that many litigants do. Possibly, they consider it a service to the court, but often it is just as easy to read a page of deposition testimony as it is to remember which precise lines to stay between. Additionally, it often appears that litigants cite to specific lines for purposes of obfuscation, hoping the court will not look beyond a narrow band of lines because a statement might not be credited if it did. In any event, parties are free to cite lines if they choose. They should understand, however, the reading eye often refuses to conform to these strict line demarcations and certainly live testimony cannot be clipped in such an artificial fashion. The Court is not required to credit an inaccurate statement when it is apparent that its proponent is "caging" deposition testimony in a misleading fashion. By comparison, the plaintiff generally asked that the Court read a whole page, or a couple of pages, in order to pick up some nuance in support of a qualification or denial. There is nothing objectionable in this approach either. The point of the Local Rule 56 process is to keep the Court from having to ferret through the record unaided by counsel. There is nothing overly burdensome in the citations offered by the plaintiff's counsel and I cannot think of a judicial officer in this district who would be unwilling

14

to read a few pages of deposition testimony in order to resolve a summary judgment motion simply because a line citation is not offered.  All of these "pinpoint" objections are stricken.

> *"T-Mobile objects to Plaintiff's denial of this statement of fact and states that it should be stricken from the record as Plaintiff's affidavit contradicts the sworn testimony provided with the supporting citations . . . ."*

This kind of objection obviously needs to be made, assuming that an actual contradiction is established in the record.  I believe it is appropriate to raise it in a reply statement as a "should be stricken" assertion allowed under Local Rule 56(e), where the new material is introduced by way of qualification or denial.  I do not strike these objections, which is not to say that I have sustained them, either, because in most instances the affidavit does not contradict as much as elaborates upon the deposition testimony.  I also understand that the defendant needs to respond to a denial or qualification in this sort of circumstance, where new material is introduced for the first time in the denial or qualification.  At a minimum I would agree with the defendant that there is some ambiguity in Local Rule 56(d) about what to do when "additional facts" or challenged evidentiary sources are introduced for the first time in a denial or a qualification rather than in the statement of additional facts.   I do not think, in that circumstance, it is totally out of line for the movant to call the matter to the court's attention under Local Rule 56(d) in a reply statement of material facts.  However, those sort of legitimate concerns are few and far between in the 27 and one-half pages of "objections" contained in the defendant's reply statement.

> *Actual responses to the plaintiff's evidentiary objections.*

It is perfectly appropriate for the defendant to reply with respect to one of its initial statements in order to respond to an evidentiary objection raised by the plaintiff in her opposing statement.  For example, it is certainly appropriate for the defendant to cite Rules 801(d)(2) and

803(4) of the Federal Rules of Evidence in response to a hearsay objection.  These portions of the defendant's reply are not stricken.  However, it is not technically correct for the defendant to "object" to the evidentiary objection or ask that the objection be "stricken."  It would suffice to simply address the evidentiary objection.  Indeed, it would be *much* more effective because the evidentiary reply would not be buried in so much dross.

### DISCUSSION

Venable's First Amended Complaint asserts two claims for relief.  The first claim asserts wrongful denial of a reasonable accommodation.  The second claim, as alleged, asserts retaliatory dismissal for requesting an accommodation, but is briefed by both parties as a discriminatory discharge claim.[7]  Venable asserts these claims exclusively under the Maine Human Rights Act (MHRA).  (First Am. Compl., Doc. No. 6.)  As for the failure to accommodate claim, T-Mobile argues that it must fail because Venable did not adequately request a leave of absence (Mot. at 2, 18-19) and because "any accommodation was unrelated to the reasons for her termination," meaning that the Topomax side effects were not the cause of Venable's misconduct so that a leave of absence to adjust to the drug would not have made Venable any more able to conduct herself appropriately in the workplace (Mot. at 2, 16-18).  As for the claim of discrimination, T-Mobile argues that Venable was legitimately fired because of misconduct (Mot. at 2, 11-13) and that she was not able to perform the essential functions of her job with or without an accommodation (Mot. at 2, 14-15).  For these reasons, T-Mobile maintains that it is entitled to summary judgment against both claims.

---

[7]     The second claim seems to have evolved into a discriminatory discharge claim, without a focus on the "retaliation" language of the First Amended Complaint.  T-Mobile has not taken issue with it and has itself briefed the second claim as a discriminatory discharge claim.

A party moving for summary judgment is entitled to judgment in its favor only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if its resolution would "affect the outcome of the suit under the governing law," and the dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In reviewing the record for a genuine issue of material fact, the Court must view the summary judgment facts in the light most favorable to the nonmoving party and credit all favorable inferences that might reasonably be drawn from the facts without resort to speculation. P. R. Elec. Power Auth., 515 F.3d at 62. If such facts and inferences could support a favorable verdict for the nonmoving party, then there is a trial-worthy controversy and summary judgment must be denied. Azimi v. Jordan's Meats, Inc., 456 F.3d 228, 241 (1st Cir. 2006).

Viewed in the light most favorable to Venable, the summary judgment record reveals the existence of genuine issues of material fact that preclude the entry of summary judgment on Venable's claims. The reasons for this conclusion are discussed below, starting with the claim of failure to accommodate.

## A.      Failure to Accommodate

The Maine Human Rights Act provides that the failure to make a reasonable accommodation for a "qualified individual with a disability" and the denial of employment opportunities to disabled employees on the basis of a need for accommodation are both acts of discrimination unless the employer can demonstrate that the requested accommodation would impose an undue hardship on the employer. 5 M.R.S. § 4553(2)(E), (F). Showing that a

17

requested accommodation is reasonable and that the employee is qualified to perform the essential functions of the job with the requested accommodation (or without it) is sufficient to support a failure to accommodate claim without any additional evidence that the employer subjectively harbored discriminatory animus.  See Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 264 (1st Cir. 1999) (explaining that a failure to accommodate claim does not require a showing of a discriminatory animus and that "any failure to provide reasonable accommodations for a disability is necessarily 'because of a disability'").  There are three elements to this claim.  First, the employee must qualify as disabled.  Second, the employee must have been able to perform the essential functions of the job with or without reasonable accommodation.  Third, the employer must have refused to extend the accommodation despite knowing of the disability and the request for the accommodation.  Freadman v. Metro. Prop. & Cas. Ins. Co., 484 F.3d 91, 102 (1st Cir. 2007).  The record is sufficient to meet these three requirements and T-Mobile fails to argue that a request of the kind at issue here would have imposed an undue hardship on T-Mobile.

### 1.  Disability status

This element is not targeted in T-Mobile's motion, possibly because the standard for determining whether a person is disabled for purposes of the MHRA is significantly lower than the standard that obtains for purposes of the Americans with Disabilities Act or because the evidence is sufficient to support a finding that Hicks regarded Venable as having a disability, either in the form of epilepsy or in the form of a temporary, medication-induced disability.

### 2.  Ability to perform

T-Mobile argues that this case is not about Venable's reaction to Topomax, but about a long-term pattern of misconduct that persisted without regard to Venable's medication.  (Mot. at

18

16-18.)  That appears to present a good defense, with some evidence to support it, but the facts are not so one-sided as to justify the entry of judgment as a matter of law.  The record is sufficient to support a finding that Venable's job performance as a trainer suffered significantly after she began taking Topomax.  For the first time, she had a class of trainees that seriously underperformed.  According to Hicks, the poor performance of her trainees was due to her demeanor.  According to Venable, she experienced heightened aggression and "snappishness" after she began taking Topomax.  In appreciation of these possible side effects, her then treating doctor recommended that she take a leave of absence to adjust to the medication.  Venable's later doctor, also her expert witness, opines that these side effects can be legitimate and can resolve in time.  The record does not establish that Venable's prior classes performed poorly, whether due to demeanor or otherwise, before she began taking Topomax.  This discrepancy in performance has some tendency to suggest that Venable's demeanor had no adverse impact on her performance as trainer prior to the introduction of Topomax.  Additional evidence in the record can support a finding that T-Mobile is being hyperbolic about Venable's pre-Topomax demeanor and conduct for the sake of litigation.  Among other facts, Venable was named trainer of the month at a time when she was having some conflict with certain problem trainees.  The inference is that some conflict is a normal incident to her job.  Additionally, Venable was never subjected to any formal, stepped, disciplinary action in relation to the alleged misconduct.  On balance, it is possible that the finder of fact could reasonably conclude that the transition to Topomax was causally related to Venable's termination and that providing her with a leave of absence in May 2006 would have been a reasonable way to accommodate Venable's efforts to adjust to the prescribed medication, especially as she had only been diagnosed as having epilepsy some six months prior.

### 3.  Refusal to accommodate

T-Mobile argues that it did not refuse Venable a reasonable accommodation in May

because she never requested an accommodation in a sufficiently direct and specific manner.

(Mot. at 18-19.)  The requirement that an employee request an accommodation in a "direct and

specific" manner relates to the fact that the anti-discrimination laws are written in terms of the

failure to accommodate *known* disabilities and identifiable accommodations.  Freadman, 484

F.3d at 102.  The law, however, does not provide that a request cannot be conveyed verbally or

that an employer cannot be found to have denied a request that is never formally submitted in

writing.  On this record, there is no appreciable reason why the finder of fact could not conclude

that T-Mobile understood that Venable wanted to take a leave of absence *in May*,[8] based on her

doctor's recommendation, or that T-Mobile would have understood quite clearly that Venable's

request related to her relatively recent epilepsy diagnosis and the effort to find the most suitable

medication for her, or that her request was specific to the most-recently prescribed Topomax

medication.  The record is also sufficient to support a finding that T-Mobile denied the request,

based on Venable's account of her conversations with Hicks and Davidson.[9]

---

[8]      T-Mobile argues that this case is "strikingly similar" to Freadman.  In that case the First Circuit held that
the plaintiff had not made a specific and direct request for leave because her verbal statement that she needed to take
time off was not specific as to when she would need to take the time off.  484 F.3d at 103-104.  In other words, the
fact that the request was verbal was not the problem.  The problem was that the request was too vague as to when
the leave would commence.  Id.  Additionally, the employer "reasonably suggested" that the plaintiff start her leave
a week later and the plaintiff did not object.  Id. at 104.  Consequently, the First Circuit reasoned that the fact finder
could not conclude that a request had been made to commence leave any sooner than what was suggested by the
employer.  Id.  Here, the scenario is different.  According to Venable, she stated to Hicks that she was ready to
submit a written request for leave commencing that day for a limited amount of time to adjust to a new medication.
These facts demonstrate an immediate need, not an indefinite need that might get postponed for a week or more.

[9]      T-Mobile does not offer any evidence that really refutes Venable's affidavit testimony that she told Hicks
she was ready to fill out the paperwork and that he told her it was not a good time and that he would monitor her
behavior instead.  Venable's statements, at paragraphs 170-173, are denied as a factual matter, but T-Mobile's
references to page 71, lines 11-16, of the Hicks deposition and paragraph 44 and 46-49 of his declaration do not
divulge any testimony to the effect that he did not actually say these things to her.  Of course, Venable's testimony
would be credited for purposes of summary judgment, regardless of Hicks's account, but the point is that T-Mobile

**B.      Disability Discrimination**

With her discrimination claim, Venable contends that the decision to terminate her was motivated by the fact that she was disabled and was temporarily unable to perform her job for a reason related to her disability.  To carry her burden on this claim Venable needs to demonstrate that there is sufficient evidence in the record of a subjective intention on the part of the relevant decision makers to terminate her employment because of her disability.  Because there is no direct evidence that T-Mobile purposefully discriminated against Venable, she must attempt to prove the existence of a discriminatory motive by relying on circumstantial evidence.  The sufficiency of such evidence is determined by resort to the McDonnell Douglas burden shifting methodology.  Me. Human Rights Comm'n v. Auburn, 408 A.2d 1253, 1261-62 (1979) (discussing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)).  That methodology is as follows:

**1.  Prima facie case**

The first step in the McDonnell Douglas methodology is for the plaintiff to establish a prima facie case of disability discrimination.  A prima facie case consists of evidence that:  (a) the plaintiff has a disability within the meaning of the MHRA;  (b) the plaintiff is qualified to perform the essential functions of the job, with or without reasonable accommodation;  and (c) the plaintiff was subject to an adverse employment action based in whole or in part on her disability.  Higgins v. New Balance Athletic Shoe, 21 F. Supp. 2d 66, 71 (D. Me. 1998);  Dudley

---

has endeavored to refute these contentions and has produced a declaration from Hicks for that very purpose without ever including a statement squarely denying that he told her these things.

v. Augusta Sch. Dep't, 23 F. Supp. 2d 85, 93 (D. Me. 1998);  Doyle v. Dep't of Human Servs.,
2003 ME 61, ¶ 14, 824 A.2d 48, 54.  What has already been said in regard to the failure to
accommodate claim suffices to settle the first two items.  That leaves prima facie causation.

A finder of fact can infer that a causal connection exists between an adverse employment
action, such as termination, and an employee's status as disabled based on various kinds of
circumstantial evidence.  Here, the record could support a finding that Venable was terminated
from employment roughly one month after she requested a leave of absence arising from a
continuing effort to find suitable medication.  This is a relatively close temporal connection
between Venable's attempt to obtain an accommodation in connection with her disability and her
discharge.  Temporal proximity is not all this record offers.  According to Venable, Hicks told
her that he would monitor her behavior and revisit the matter of leave if a problem should arise.
One way of viewing this evidence is that Venable got set up to fail.  Although that is by no
means an inevitable finding, it would be possible to find on this record that T-Mobile (through
Hicks) understood that it was taking a chance on how Venable might react to her medication and
that it would have to be solicitous of Venable's interest should a problem arise since it had
refused her reasonable request for short-term leave.  Under these circumstances, T-Mobile's
decision to fire Venable for what, it now alleges, were serious incidents of misconduct, but
which could rather be viewed as poor performance issues with one class of trainees due to a
medication issue, can fairly be regarded as causally connected to Venable's disability.  The
causal connection element, like the rest of the prima facie elements, imposes a "relatively light
burden."  Mariani-Colon v. Dep't of Homeland Sec., 511 F.3d 216, 224 (1st Cir. 2007).
Temporal proximity and the "set up" appearance of the facts (viewed in the light most favorable

to Venable) are sufficient to complete Venable's prima facie case and raise an inference of discriminatory motive.

### 2. T-Mobile's legitimate, non-discriminatory justification

The second step in the <u>McDonnell Douglas</u> methodology calls for the defendant to offer up a legitimate, non-discriminatory justification for its employment decision. <u>Id.</u> at 221. If it presents such a justification in suitable evidentiary form, then the presumption of discriminatory motive is suspended. <u>Thompson v. Coca-Cola Co.</u>, 522 F.3d 168, 176 (1st Cir. 2008). T-Mobile meets this burden thanks to its proper presentation of the following fact statement, which is supported by the sworn affidavit testimony of Mr. Hicks:

> 108.    Mr. Hicks decided to terminate [Venable] because of her failure to improve how she conducted herself toward her students and her peers and because he believed it was apparent that [Venable]'s improper behavior was not going to change. Hicks Dep. at 90:3-91:9; Hicks Decl. at ¶¶ 39-40.

### 3. Evidence of pretext

Finally, the burden returns to the plaintiff to establish that the evidence is sufficient for the fact finder to draw a reasonable inference of discriminatory motive. This is accomplished by generating a genuine dispute as to whether the employer's justification has the appearance of pretext, as in an excuse designed to hide discrimination. <u>Id.</u> at 176. Venable argues that she meets this challenge because she has introduced evidence tending to demonstrate that the so-called misconduct that occurred during her first three training classes was never treated by T-Mobile as deserving any form of stepped discipline. Additionally, Venable observes that she was named trainer of the month in January 2006, which fact casts her prior conduct issues in a

far more favorable light.  Venable also points to the evidence that the alleged misconduct was never stated to her as the reason for her termination and that T-Mobile represented to the Bureau of Unemployment Compensation that it was poor performance rather than misconduct that resulted in her discharge.  These arguments are well put and the record is sufficient to permit the finder of fact to make findings in support of them.  In addition to these reasons why a finding of pretext can be made on this record, I also note that T-Mobile's justification is stated in a way that permits another kind of finding that a causal connection exists between Venable's status as disabled and her termination.  T-Mobile states that Venable was justifiably discharged because she failed to "improve" her conduct.  This assertion is based on evidence of Venable's misconduct after she began taking Topomax.  The record is sufficient to support a finding that the decisionmaker at issue, Mr. Hicks, understood that there was a risk in his decision to dissuade Venable from taking temporary leave so that she might adjust to her new medication somewhere other than at T-Mobile's call center.  A reasonable fact finder could fairly conclude that, under such circumstances, terminating her based on a "failure to improve" rationale was a discriminatory act because a reasonable fact finder might ponder how T-Mobile could have fairly expected her to "improve" under these conditions.  Venable's summary judgment showing suffices to generate a genuine issue of pretext and discriminatory motive.

## CONCLUSION

Plaintiff's Motion to Strike Defendant's 'Objections' to Plaintiff's Opposition to Defendant's Statement of Material Facts (Doc. No. 39) is GRANTED, IN PART.  I RECOMMEND that the Defendant's Motion for Summary Judgment (Doc. No. 29) be DENIED.

NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

November 14, 2008